# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

UNITED STATES OF AMERICA,

|  |  |  |  |
|---|---|---|---|
| | Relator, | : | Case Nos. 3:13-mc-15 |
| | | | Consolidated with 3:13-mc-16 |
| | | | |
| | | | District Judge Timothy S. Black |
| - vs - | | | Magistrate Judge Michael R. Merz |

DAVID  W. BARKER, M.D., et al.,

|  |  |  |
|---|---|---|
| | Respondents. | : |

# REPORT AND RECOMMENDATIONS

The Court commenced these contempt proceedings to vindicate its authority to protect presentence investigation reports ("PSI's") from unauthorized disclosure.

The cases were begun by Orders to Show Cause issued to Respondents David Barker and his attorney Andrew Yosowitz.  Respondents now move to dissolve the show cause orders and dismiss the cases (Doc. Nos. 11 & 12).[1]  At the Court's direction, the United States has filed a Memorandum in Response (Doc. No. 14) and Respondent Barker has filed a Reply (Doc. No. 17).[2]  District Judge Black has referred the cases for a report and recommendation on the pending Motions (Doc. No. 15).

---

[1] The reference to "Donald" Barker in the caption of the order to Show Cause is a misnomer.  The proper Respondent is David W. Barker, M.D. and Judge Black ordered the caption amended (Minute Entry, October 18, 2013).

[2] Respondent Yosowitz waived his opportunity to file a reply (Doc. No. 16).

**Procedural History**

Judge Black issued the Orders to Show Cause on October 10, 2013 (Doc. No. 1). Respondents were ordered to show cause why they should not be held "in civil and/or criminal contempt of court for failing to comply with this Court's Order prohibiting copying and distribution of the Court's confidential Presentence Investigation Report relating to one of the Court's criminal defendants." *Id.* at PageID 1 and Case No. 3:13-mc-16, Doc. No. 1, PageID 1.

The Orders to Show Cause were prompted by a motion requesting such action filed by Assistant Federal Public Defender Cheryll Bennett as counsel for Jeffrey Walden, Defendant in *United States v. Walden*, Case No. 3:12-cr-137; the Motion is at Doc. No. 15 in that case (hereinafter *US v. Walden*, Doc. ___).  Ms. Bennett's Motion represented that Dr. Barker obtained a copy of Mr. Walden's PSI in that case, copied it, and distributed it to at least five other people (Show Cause Motion, Doc. No. 15, PageID 36).  Ms. Bennett alleged that:

> Dr. Barker's actions are in violation of local Rule 32.1, which provides "The presentence report and related documents shall be maintained in confidence and under seal. *Unauthorized copying or disclosure of the information contained in any draft or final presentence report, addendum, statement, or attachment to such a report will be an act in contempt of Court, and punished accordingly.*" Local Rule 32.1(k) (emphasis added).

*Id.* at PageID 37.  The Show Cause Order issued to Mr. Yosowitz was premised on the belief that he was the source of the copies which Dr. Barker obtained.  Both Respondents were ordered to show cause why their actions did not constitute contemptuous violation of S. D. Ohio Crim. R.

32.1.  After conference with Judge Black, the two cases were consolidated and a deadline set for Respondents to file the instant dispositive motions (Minute Entry, Oct. 18, 2013).

**Findings of Fact**

For purposes of the instant Motions, the Magistrate Judge finds the following facts from the records of the Court or from the submissions of the parties.

On October 31, 2012, Jeffrey Walden was charged in a one count Information with theft of trade secrets between November 11, 2008, and February 14, 2010 (*US v. Walden*, Doc. No. 2). Walden and the United States entered into a Plea Agreement in that case (*Id.* at Doc. No. 5) pursuant to which Walden pled guilty to the Information on December 13, 2012, and was referred to the United States Probation Department for a Presentence Investigation Report ("PSI"). *Id.* at Doc. No. 6.  On May 23, 2013, Judge Black adopted the PSI (hereinafter the "Walden PSI") without any objection by either party and imposed a probation sentence on Walden. *Id.* at Doc. No. 12.  The next action in *US v. Walden* was Ms. Bennett's Motion for an Order to Show Cause. *Id.* at Doc. No. 15.

On June 16, 2011, FBI agents executed a search warrant at 3937 Cloud Park Drive, Apartment C2 and found Walden and JF; JF was nineteen years old at the time.  Numerous digital storage devices were seized which, upon forensic examination, yielded evidence upon which Walden was convicted in *US v. Walden*.  The same forensic examination yielded a number of images of JF taken when she was a minor and engaged in sexual conduct or sexually suggestive poses.  Walden PSI ¶¶ 51-53.

Respondent Barker was married to Kimber Barker, but their divorce became final January 19, 2011, when the Franklin County, Ohio, Common Pleas Court, Domestic Relations Division, entered a final decree (Doc. No. 11, Ex. A). Three children had been born issue of the marriage and the Barkers entered into a shared parenting agreement which was approved by the Court. *Id.* at 42. The decree imposed a significant spousal support obligation on Respondent which would be terminated, *inter alia,* if Kimber Barker were "cohabiting with a significant other." *Id.* at PageID 46.

Dr. Barker performed his share of parental duties in Tennessee where Kimber Barker lived with the children. He learned from his children, including a fourteen-year-old daughter, that they were having unsupervised sleepovers at Walden's apartment (Barker Affidavit, attached to Doc. No. 12, PageID 69, ¶ 7). At some point early in 2013, he began to suspect that Kimber Barker was in fact cohabiting with Jeffrey Walden at her Knoxville, Tennessee, home. *Id.* at ¶ 8. He then engaged Kendall Investigations to determine if that was the case and to provide evidence. He learned that Kendall's agents performed a "trash pull" at Kimber Barker's home and found, among extensive evidence that Walden was living there, a copy of the Walden PSI which they sent to Respondent Barker. *Id.* at ¶¶ 9-10.

Reading the Walden PSI, Barker learned the information in ¶¶ 51-53 summarized above. He then "took the [Walden PSI] to my domestic relation's [sic] attorney Joanne Beasy" and discussed it with her. *Id.* at ¶ 11. He avers further that "I was never informed by my attorney Ms. Beasy that there was a local rule about confidentiality, nor did I learn about the local rule myself." *Id.* at ¶ 11. Indeed, he avers further that his attorney told him both orally and in writing that "by placing the report in the garbage any confidentiality was lost."

Respondent Barker avers that he sent the Walden PSI first to his former father-in-law and former sister-in-law "accompanied by an email message" attached to his Affidavit as Exhibit B. That message indicates there is an "attached report" and the attachment is labeled "312cr137.pdf."[3]  That number replicates the case number of *US v. Walden*.  Since what Kendall Investigations pulled from the trash at Kimber Barker's home was a paper version of the Walden PSI, the email message effectively constitutes an admission by Respondent Barker that he copied the Walden PSI by scanning it and then attached the resulting .pdf copy to the email.  Barker also admits that he sent the Walden PSI to Kimber Barker on June 22, 2013,[4] and to "a detective in the police department where the relationship [between Walden and the female minor] occurred." *Id.*  at ¶¶ 14, 17.  Barker then offers a number of details about ensuing email exchanges which ground his concern about contact between Walden and his own minor daughter. *Id.*  at ¶¶ 16-19. Finally, he avers he did not know of S. D. Ohio Crim. R. 32.1 until seeing the Motion for Order to Show Cause and did not willfully violate the rule.  *Id.*  at ¶ 20.

Joanne Beasy is a partner in the law firm of Isaac, Wiles, Burkholder & Teetor, LLC (Beasy Affidavit, Doc. No. 11, Ex. B., PageID 50, ¶ 11).  She was retained by Dr. Barker on June 17, 2013, **after**[5] he sent copies of the Walden PSI to North and Andrykowski, to represent him in post-decree matters in the divorce case.  Having read the Walden PSI, she asked Respondent Yosowitz, an attorney in her office with experience in criminal matters, "on how best to get a victim of crime in touch with the authorities." *Id.*  at ¶ 6.  On August 1, 2013, having

---

[3] The Court has also been furnished by Assistant Federal Public Defender Bennett with 13' x 10' manila envelopes addressed to John North and Julie Andrykowski, respectively, postmarked Columbus, Ohio, on June 14, 2013, containing printed copies of the email and hard copies of the Walden PSI.
[4] Ms. Bennett has also furnished an envelope identical to those mentioned in note 3 addressed to Kimber Barker and postmarked Columbus, Ohio, on June 22, 2013.  The envelope contains a letter from Dr. Barker to Kimber Barker and a copy of the Walden PSI reproduced by a method which did not reproduce the colored stamped legends which appear on the North and Andrykowski copies:  "Confidential" and "Final" in red and "Copy in blue."
[5] Beasy's Affidavit on this point contradicts Barker's claim that he only acted after seeking the advice of counsel because the North and Andrykowski envelopes are postmarked June 14, 2013.

further discussed the matter with Respondent Yosowitz, she "received an electronic copy of an email Mr. Yosowitz sent to Captain Anderson" of the Troy, Ohio, Police Department with the Walden PSI attached. *Id.* at ¶ 7.

Respondent Yosowitz is an associate attorney with Ms. Beasy's firm (Yosowitz Affidavit, Doc. No. 11, Ex. C., PageID 52, ¶ 2.) Yosowitz avers Ms. Beasy told him about recovery of the Walden PSI from Kimber Barker's trash, the information therein about possible sexual offenses with a minor, the confirmation by that minor of a sexual relationship with Walden while she was still a minor, and of her desire in 2013 to pursue criminal charges against Walden. *Id.* at ¶ 4. Ms. Beasy told him she had advised Assistant United States Attorney Dwight Keller that "she had a copy of the PSR which had been recovered from Dr. Barker's ex-wife's trash." *Id.* at ¶ 8.

Ms. Beasy told Yosowitz, based on brief research, that she "did not believe that confidentiality applied any longer because Mr. Walden had abandoned the PSR in his trash." *Id.* at ¶ 10. On August 1, 2013, Yosowitz emailed the Walden PSI to Captain Anderson. *Id.* at ¶ 15. Yosowitz concludes:

> 19. I would never willfully, deliberately or intentionally violate a court order or local rule;
>
> 20. I do not and have never practiced criminal law in any federal court. At the time I sent the email to Captain Anderson, I was not aware of S.D. Ohio Crim. R. 32.1 (k). Further, when I was a prosecutor, the issue of PSR disclosure (or non-disclosure) never came up. I do not recall ever reading, asking to read, or having possession of a Franklin County PSR;
>
> 21. I was simply trying to provide the detectives at the Troy, Ohio Police Department with as much detail as I could about the crime(s) they would be investigating. It never occurred to me that

the PSR could not be disclosed to law enforcement officers about
to investigate a crime which is referenced in the PSR.

*Id.* at PageID 55.  In addition to the copy sent by Yosowitz to Anderson, Barker himself sent

another copy on August 8, 2013, to Christopher Tilley, a detective with the Troy Police

Department assigned to investigate possible criminal charges against Walden arising from his

sexual conduct with JF when she was a minor.  (Detective Tilley furnished Probation Supervisor

Tracy Gearon with a copy of the Walden PSI he received from Barker and the cover email from

Barker to Tilley.)

None of the affiants mention that the copies of the Walden PSI sent to Andrykowski and

North have the legend "CONFIDENTIAL" rubber-stamped in red ink in the upper right hand

corner of the first page.[6]  None of them indicates that he or she paid the least attention to that

word although it is stamped on what is plainly an official document of this Court.  The attorneys

claim they never learned until they saw Ms. Bennett's Motion that this Court has a rule relating

to the confidentiality of presentence investigation reports, although that rule is readily available

to the general public on the Court's internet website at www.ohsd.uscourts.gov.

None of the affiants mention that the copies of the Walden PSI sent to North and

Andrykowski do not have the second page, but those sent to the Troy Police do.  Page two

includes the identifying data on Walden and the following standard language included in all

presentence investigation reports:

**Restrictions on Use and Redisclosure of Presentence
Investigation Report.**

---

[6] Prior to July 1, 2013, the original PSI was sent to the sentencing judge with only the legend "Confidential"
stamped on it.  The other four copies had the legends "Final" and "Copy" also rubber-stamped on them.  As of July
1, 2013, the legends are added electronically.

Disclosure of this presentence investigation report to the Federal Bureau of Prisons and redisclosure by the Bureau of Prisons is authorized by the United States District Court solely to assist administering the offender's prison sentence (i.e., classification, designation, programming, sentence calculation, pre-release planning, escape apprehension, prison disturbance response, sentence commutation, or pardon) and other limited purposes, including deportation proceedings and federal investigations directly related to terrorist activities.   If this presentence investigation report is redisclosed by the Federal Bureau of Prisons upon completion of its sentence administration function, the report must be returned to the Federal Bureau of Prisons or destroyed.  It is the policy of the federal judiciary and the Department of Justice that further redisclosure of the presentence investigation report is prohibited without the consent of the sentencing judge.

## Analysis

**Confidentiality of Presentence Investigation Reports**

Preparation of a PSI is governed by 18 U.S.C. § 3552 and Fed. R. Crim. P. 32 which require that the report be furnished to the defendant, defendant's counsel, and the attorney for the Government before sentencing.  Prior to 1966 there was no provision for disclosure of a PSI to anyone but the sentencing judge and the Supreme Court had held due process does not require disclosure even to the defendant.  *Williams v. New York*, 337 U.S. 241 (1949).  Revisions of Rule 32 over time broadened disclosure to the parties to the case, but preserved the "general rule of the inherent confidentiality of presentence reports."   (Memorandum of Administrative Office Associate General Counsel David Adair, August 1998.)

> The principle of confidentiality of presentence information and directions to probation officers to maintain confidentiality are set out in the Probation Manual, Guide to Judiciary Policies and Procedures, Vol. X, Chapt. IV(D); Administrative Office of the United States Courts, The Presentence Investigation Report 2-3, 17-18 (Publication 105, 1984); and Administrative Office of the United States Courts, Presentence Investigation Reports Under the Sentencing Reform Act of 1984 IV-13 (Publication 107, 1988).

*Id*. Beyond that authorized by the referenced rules or by express order of court, probation officers have no discretion to disclose confidential court information, either the PSI itself or information gathered in the process of writing the PSI. *Id*. The sentencing court retains authority to permit or deny release of the PSI. *United States v. Charmer Industries, Inc.,* 711 F.2d 1164, 1176-77 (2d Cir. 1983); *United States v. Huckaby*, 43 F.3d 135 (5th Cir. 1995). Regulation of release by local rule is not uncommon. (Adair letter.)

In *Charmer Industries, supra*, a defendant, the subject of a PSI in Brooklyn, sought to prevent its use by the Arizona Attorney General in liquor license proceedings.[7] The Second Circuit noted the assurances of confidentiality given to sources of PSI information:

> Frequently information disclosed to probation officers during the presentence investigation is given to the investigators in confidence. For example, a defendant may disclose his income but not wish to have those figures made public. A psychiatrist may provide an evaluation whose availability would best be restricted to the court and those involved in the defendant's rehabilitation. Law enforcement agencies frequently wish to protect the sources of information in their records and will sometimes exact a promise of confidentiality from the probation officer. In order to ensure the availability of as much information as possible to assist in sentencing, the courts have generally determined that presentencing reports should be held confidential. *See, e.g., United States v. Martinello*, 556 F.2d 1215, 1216 (5th Cir. 1977) (per

---

[7] The Arizona Attorney General had obtained the report from the Brooklyn probation office merely by asking for it.

9

curiam); *United States v. Greathouse*, 484 F.2d 805, 807 (7th Cir. 1973); *United States v. Fischer*, 381 F.2d 509, 511-13 (2d Cir. 1967), *cert. denied*, 390 U.S. 973, 19 L. Ed. 2d 1185, 88 S. Ct. 1064 (1968).

*Id.* at 1171. The court noted there were no reported cases and only one unreported case in which disclosure of a PSI to a third party had been ordered by a court. *Id.* at 1173. It noted further that the American Bar Association Standards for Sentencing called for PSI's to be confidential. *Id.* at 1174, n. 10. Most courts considering the issue set disclosure standards close to those for grand jury materials and the Second Circuit adopted that standard. *Id.* It held:

> [I]n light of the nature of the presentence report as a court document designed and treated principally as an aid to the court in sentencing, we conclude that the report may not properly be disclosed without authorization by the court. Given the desirability of ensuring the free flow of information to the court and the fact that the document can and frequently does serve its principal purpose notwithstanding the presence of misstatements -- on which the court simply declines to rely -- or disputed statements, we conclude that the court should not release a presentence report to a third person unless that person has shown a compelling need for disclosure to meet the ends of justice.

*Id.* at 1176. The circuit court then reversed the district court and ordered entry of an injunction "requiring the Arizona AG to return to the court the Peerless Report and all copies and extracts made of it, prohibiting his publication or other use of any portion of the Report that is not already publicly available . . ." *Id.* at 1178.

National judicial policy as reflected in the Guide to Judiciary Policy, Vol. 8, Part D in its latest revision (December 28, 2010) is even stricter than that reflected in the Adair letter and *Charmer*. The current Guide language provides that "[t]he presentence report is a confidential document." § 630(a).

> Investigative or prosecutorial use of the report is incompatible with its purpose. As a general rule, the presentence report is unavailable to anyone other than as described above, without permission of the court. The presentence report is primarily for court use, and court policies should be rigidly followed in revealing the contents of the report beyond the court. Except for the provisions noted above [as to disclosure to parties], the court has complete discretion as to the disclosure of the presentence report, and consent of the court should be sought before other disclosures are made.

*Id*. at § 630(c). The Guide also notes that a contrary state court order is barred by the Supremacy Clause and "[c]ircumstances warranting disclosure of probation records are rare and determined by the sentencing judge." *Id*. at § 630(d).

This national concern for the confidentiality of PSI's and policy of protecting that confidentiality is reflected in the Court's adoption of S. D. Ohio Crim. R. 32.1(k). It is the only prohibition in the entire set of local rules, civil and criminal, to which the threat of contempt sanctions is expressly attached.

Rule 32.1(k) is part of a long rule regulating preparation and disclosure of PSI's and is followed by Rule 32.2 which adopts a requirement that before a probation officer testifies or produces official documents, she or he must consult with the Chief Judge.

It is worth noting the well-regulated process by which local rules are adopted. 28 U.S.C. § 2071 authorizes federal courts to adopt rules "for the conduct of their business." However, such rules must be consistent with Acts of Congress and national rules adopted by the Supreme Court. *Id.* at subsection (a). Local rules can take effect only after public notice and an opportunity for comment. *Id.* at subsection (b). Local rules are subject to abrogation both by the judicial council of the circuit and by the Judicial Conference of the United States. *Id.* A district court is prohibited from adopting any rule except under § 2071. *Id.* at subsection (f). Fed. R.

Civ. P. 83 reinforces these limitations and further provides that local rules may be adopted only on majority vote of the district judges.  In this District, local rules are initiated through a standing committee of the Court comprising practicing attorneys and some of the judges.  Notably, both the Federal Public Defender[8] and the United States Attorney are represented by attorneys of their choosing.  See www.ohsd.uscourts.gov/committees.htm at Local Rules Committee.  Certainly both the content of the local rules and the process of adopting them is completely transparent.

In sum there is a long-standing federal policy that PSI's remain confidential, enforced  by both national and local rules, and repeatedly upheld in the appellate courts.  It is that policy which Respondents are alleged to have violated by copying and distributing the Walden PSI.

**The Motions to Dismiss**

Respondents do not deny copying and distributing the Walden PSI; in fact they admit doing so (Barker Affidavit, Doc. No. 12-1, PageID 69-70, ¶¶ 11-14; Yosowitz Affidavit, Doc. No. 11-3, PageID 54, ¶ 15).  Nor do they quarrel with the general federal policy that PSI's should remain confidential.  Instead, they attack generally the power of the Court to enforce S.D. Ohio Crim. R. 32.1(k) by contempt proceedings at all, or at least as to persons in their positions.  Then they defend their own particular violations of the Rule with facts specific to this case.  The Magistrate Judge considers those defenses in the order they are presented.

---

[8] If memory serves, Yosowitz's counsel, Mr. Nolder, was himself a member of the committee when Rule 32.1 was adopted.

**General Defenses to Use of the Contempt Power to Enforce this Local Rule**

Respondents[9] begin their analysis by concluding that this matter must have been brought under 18 U.S.C. § 401 which provides

> A court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other, as—
>
> (1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;
>
> (2) Misbehavior of any of its officers in their official transactions;
>
> (3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.

Because the asserted contemptuous conduct did not occur in open court, Yosowitz reasons the prosecution cannot be under 401(1) and he is correct.  Section 401(1) deals with "direct" contempt of court and that is not what occurred here.  Wayne LaFave, Substantive Criminal Law 2d, §1.7(e).

Yosowitz also asserts his conduct does not come within § 401(2) because he was not acting as an "officer" of the Court in an official transaction.  By his own admission, Yosowitz is a member of the bar of this Court, admitted in 2008 (Yosowitz Affidavit, Doc. No. 15, Ex. C, PageID 52, ¶ 2).  Although it is often said that attorneys are "officers of the court," the Supreme Court has held attorneys do not come within the term "officer" in § 401(2).  *Cammer v. United States*, 350 U.S. 399 (1956). Dr. Barker is plainly not an officer of this Court.  This contempt matter therefore cannot proceed under 18 U.S.C. § 401(2).

---

[9] After Mr. Yosowitz filed his Motion, Dr. Barker joined the Motion and asked for the same relief "for all the reasons set forth in Yosowitz's motion" plus supplemental argument (Notice of Joining Motion, Doc. No. 12, PageID 57).  Consequently, arguments set forth in Yosowitz's Motion are treated as jointly made.

**Asserted Lack of Jurisdiction**

Respondents assume they can only be charged under § 401(3) and their argument is focused entirely on that subsection (Motion, Doc. No. 15, PageID 28).  They assert first that they never participated in an earlier "proceeding" in this case and therefore the Court lacks jurisdiction to pursue a contempt citation against him.  (Motion, Doc. No. 11, PageID 28, relying on *Young v. United States ex rel. Vuitton Et Fils, S.A.,*[10] 481 U.S. 787 (1987)).  In *Young*, the Supreme Court held that an attorney for a party who is the beneficiary of an order whose violation is being prosecuted in criminal contempt may not be appointed to prosecute the contempt.  Respondents cite *Young* for the proposition that a "court has jurisdiction in a contempt proceeding only over those particular persons whose legal obligations result from their earlier participation in proceedings before the court."

The word "jurisdiction" in that quotation is used to describe a limit on judicial power in contrast to a straw man erected by Justice Scalia in his concurrence in *Young*; it cannot be taken literally.  This Court has no doubt, for example, that if a person broke into the clerk's office and poured blood on case files, that person could be punished for contempt even if he or she was not a party to any of the cases whose files were damaged.  Compare *United States v. Moylan*, 417 F.2d 1002 (4th Cir. 1969).  In any event, the issue in *Young* was not the district court's jurisdiction in contempt, but whether it could appoint counsel for one of the parties to prosecute that contempt.  The quoted sentence is not part of the holding in *Young* and must be treated as dictum.

---

[10] Cited by Yosowitz as *Young v. United States*.

Respondents also rely on *E.A. Renfroe & Company, Inc., v. Moran*, 338 Fed. Appx. 836 (11th Cir. 2009).  There the Eleventh Circuit held a court could not hold in civil contempt a lawyer who violated an injunction imposed on other persons because he was not one of the persons enjoined nor was he an aider and abettor of any of those persons.[11]  In contrast, the contempt charge against Respondents in this case is not for violating an injunction in a case in which they were not parties, but for violating the local rule of this Court forbidding disclosing presentence investigation report.  *Renfroe* is therefore inapplicable.

Yosowitz and Barker's "participation" in proceedings in *U.S. v. Walden* is by way of their obtaining and disseminating an official court record in that case.  It cannot be the law that a "stranger" to a case can obstruct the administration of justice in the case and avoid contempt proceedings.  The disruptive spectator at a trial, protesters who block entry to a courtroom or clerk's office, and persons who commit like acts are well within the ambit of contempt law.

**Asserted Lack of Power to Enforce Local Rules by Contempt Proceedings**

Respondents assert that local rules of court cannot lawfully be enforced with contempt sanctions because, they say, the word "rule" in 18 U.S.C. § 401(3) does not include such rules. They rely on *In re Brown*, 454 F.2d 999 (D.C. Cir. 1971), and *United States v. Kinsey*, 668 F.3d 691 (9th Cir. 2012)(cited at Motion, Doc. No. 11, PageID 31-33).

---

[11] Fed. R. Civ. P. 65(d)(2) provides that the persons bound by an injunction of a federal court are the parties; their officers, agents, employees, and attorneys; and "other persons who are in active concert or participation" with any of these persons, and then only if they have received "actual notice" of the injunction.

**In re Brown**

Attorney Brown's contempt in the first cited case was caused by an error of a deputy clerk of the D.C. Circuit Court of Appeals who appointed Brown to represent an indigent appellant, although Brown was not a member of the D.C. Bar.  Brown did what he was appointed to do – zealously represent the appellant – and for his effort was rewarded with a 45-day jail sentence for contempt.  Judge Robinson's opinion for the court notes that 18 U.S.C. § 401 is based closely on the 1831 Act of Congress, 4 Stat. 487, passed to curb "serious abuses of the summary contempt power." [12]  While Brown's acts were done in the actual presence of the court, the court of appeals found there was no contempt because there was no actual obstruction of the administration of justice.  *Brown*, 454 F.2d at 1004, *citing Ex parte Hudgings*, 249 U.S. 378 (1919), and  *In re McConnell*, 370 U.S. 230, 234 (1962).  The court noted that "[p]articipation in litigation – even criminal litigation – by nonmembers of the local bar[13] simply by obtaining leave of court is a common event" and distinguished appearances by disbarred attorneys which it held punishable as contempt under 18 U.S.C. § 401(3) as defiance of the order of disbarment.  *Id.*  at 1005.

Turning to § 401(3), the *Brown* court found there was a specific local rule in point which forbade practicing law in the District of Columbia without being a member of the bar of the U.S. District Court for D.C.  Respondents cite *Brown* for the proposition that the term "rule" in § 401(3) does not encompass general, standing rules of court but instead "was used in the 'process'

---

[12]  Following English precedent, District Judge James Peck had summarily punished (i.e., without a hearing or opportunity for a defense) an attorney (infelicitously named "Lawless") for words critical of Judge Peck spoken out of court.  For this Judge Peck was impeached by the House and acquitted by only one vote in the Senate.  James Buchanan, later President of the United States, prosecuted Judge Peck on behalf of the House of Representatives, then sponsored the 1831 Act.  Fox, HISTORY OF CONTEMPT OF COURT, 202.

[13] Brown was a member of the bar of the United States Supreme Court, of the Court of Military Appeals, and of the Ninth Circuit.

sense (e.g., a ruling of the court)."  (Doc. No. 11,PageID 31, citing *Brown, supra,* at 1006.)

Actually, the *Brown* court declined to decide that question, stating:

> There arises, at the outset, the question whether a noncompliance
> with Rule 96 is a disobedience of a "rule" within the meaning of
> subdivision 3. Since every other directive which the subdivision
> speaks of -- "writ, process, order, . . decree, or command" -- is one
> which is specifically addressed to a particular person or group and
> one which traditionally has been enforceable through the contempt
> power, it may be that the "rule" to which subdivision 3 refers is the
> rule in the process sense -- the rule to show cause, the rule nisi, and
> the like -- rather than a general, standing rule of court, which
> usually draws its sanctions from other sources. [Footnote omitted.]
> **We do not pause, however, to consider the question** for there is
> an even more serious obstacle to applying subdivision 3 in the
> circumstances here.

*Id.*(emphasis added).  The *Brown* court went on to note that willfulness was an element of the

criminal contempt which had not been proven.  The case turned on that point rather than whether

local rules could ever be enforced in criminal contempt.  The *Brown* court also noted that a

general order against taking photographs in the courthouse had been enforced against a television

news photographer in *Seymour v. United States,* 373 F.2d 629 (5th Cir. 1967).


### United States v. Kimsey


Respondents also rely on *United States v. Kimsey*, 668 F.3d 691 (9th Cir. 2012).  Kimsey

was prosecuted under 18 U.S.C. § 402 and his conviction was reversed for denial of a jury trial.

Yosowitz nonetheless argues the case is relevant because §§ 401 and 402 "employ identical lists

– 'writ, process, order, rule, decree or command.'"  (Doc. No. 11, PageID 31, citing *Kimsey* at

702.)  The *Kimsey* court noted the parallel, took up the suggestion in *Brown*, and relied on

Black's Law Dictionary (2d ed. 1910) to find that in 1910-1911 "rule" meant a particular ruling in a case, as in the term "*rule nisi*."   The court noted that § 402 was initially enacted in the Clayton Act in 1915 and it believed the initial version of § 401 was adopted in the Act of March 3, 1911, at § 268.  *Kimsey*, 668 F.3d at 700.

The *Kimsey* court's history is inaccurate or at least incomplete.  Chapter 231 of the Act of March 3, 2011, was a codification of "laws relating to the judiciary," and the language of § 268 carries forward the language found in the Act of March 2, 1831, enacted in the wake of the *Peck* case, which provides:

> That the power of the several courts of the United States to issue attachments and inflict summary punishments for contempt of court, shall not be construed to extend to any cases except the misbehaviour of any person or persons in the presence of the said courts, or so near thereto as to obstruct the administration of justice, the misbehaviour of any of the officers of the said courts in their official transactions, and the disobedience or resistance by any officer of the said courts, party, juror, witness, or any other person or persons, to any lawful writ, process, order, rule, decree, or command of the said courts.

While this language appears to be limited to summary punishment of direct contempts, it contains the same string of words found in both § 401 and § 402:  "lawful writ, process, order, rule, decree, or command."[14]  Thus  the historical inaccuracy does not diminish the *Kimsey* court's argument:  if "rule" in 1915 meant a particular ruling in a case, as in "*rule nisi*," it probably carried that same meaning eighty years earlier in 1831.  It no longer carries that meaning; as the *Kimsey* court noted, the current edition of Black's "no longer contains a

---

[14] The relationship between § 401 and § 402 is explained in Frankfurter & Landis, "Power of Congress Over Procedure in Criminal Contempts in 'Inferior' Federal Courts – a Study in Separation of Powers," 37 Harv. L. Rev. 1010 (1924).  In sum, Congress provided a jury trial right for contempts under § 402 because of concerns about the use of federal court injunctions in labor cases during the Progressive era.

definition of 'rule' consistent with definition 3 of the 1910 edition." *Kimsey*, 668 F.3d at 701, n. 7.

The *Kimsey* court also noted that "rules" in the sense of general rules governing practice also existed in the early twentieth century, noting Supreme Court Equity Rule 79 which authorized District Courts to adopt general rules and regulations for the practice in equity cases. *Id.* at n. 9. It declined to find this meaning in § 401 by using the statutory interpretation canon *noscitur a sociis* to support the inference that "rule" was particularized in the way the other associated words were particularized.

Lastly, the *Kimsey* court found enforcing local rules with contempt would lead to absurd results such as fines or imprisonment "for, let's say, failing to conform to local rules specifying the width of margins, appropriate typeface, or kind of paper used for pleadings. . . . [or] for such trifling oversights as the omission of file numbers from the captions of pleadings." *Id.* at 702.

**Sixth Circuit Discussion**

Respondents also note the Sixth Circuit's opinion in *United States v. Minarik,* 1988 U.S. App. LEXIS 3402 (1988). In that case the convicted defendant in a tax fraud matter had written to his trial jurors despite a local rule that no one connected with the litigation could question them. He was convicted of criminal contempt under 18 U.S.C. § 401(3). The local rule in question forbade attorneys and parties from questioning jurors and the judge had informed the jurors of the rule in Minarik's presence. The Sixth Circuit reversed the contempt conviction because the judge's remarks were not directed to Minarik and he had not been ordered to read the rule. *Id.* at *7. Furthermore, the trial judge had said no one could "approach" the jurors and

19

the Sixth Circuit found Minarik's interpretation that that did not include writing to them to be a reasonable interpretation. *Id.* .

Minarik made an argument parallel to Respondents' which the court of appeals declined to decide:

> The defendant also argues that the District Court lacked jurisdiction to find him guilty of contempt for violating Rule 12(h) because Rule 12(h) does not fall within section 401(3)'s list of directives. We need not reach the issue of whether the word "rule" in the contempt statute means only a rule in the process sense such as a *rule nisi* or means court rules. There is simply no evidence that defendant was aware of the terms of the court rule. Unaware of its terms he could not have willfully disobeyed it. Consequently, the defendant's conviction of criminal contempt must be reversed.

*Id.* at *7-8. Like the *Brown* court, the Sixth Circuit panel in *Minarik* noted the issue without taking a position.


**Contrary Authority**


As against *Brown*, *Kimsey*, and *Minarik,* the United States Attorney cites a number of cases in which contempt authority has been used to punish violations of a court's local rules. In *United States v. Herrera,* 252 F.3d 1356, 2001 WL 422627 (5th Cir. 2001)(unpublished), an attorney was found in criminal contempt for aiding and abetting an associate in the unauthorized practice of law. The Fifth Circuit held:

> The district court found that Herrera violated its local rules by aiding and abetting Salinas' unauthorized practice of law, and, thus, was guilty as to count one. Herrera's contention that a local rule is *not* an order is without merit. A local rule is the equivalent of a standing order of the district court, *Jones v. Central Bank,* 161 F.3d 311, 313 (5th Cir.1998); and a standing order is an order for §

> 401(3) purposes. *Seymour v. United States,* 373 F.2d 629, 631 (5th Cir.1967).

*Id.* at *3.

In *United States v. Payne,* 2004 WL 1879993 (N.D. Ill. 2004), an attorney was held in criminal contempt for violating a local rule forbidding making false statements to a tribunal. Against the attorney's argument that 18 U.S.C. §401(3) did not encompass punishment for violating a local rule, the court held that it did, citing *Marthaler, infra, Kozel, infra,* and *United States v. Morrissey,* 996 F. Supp. 530 (E.D. Va. 1998), *aff'd* 168 F.3d 134 (4th Cir. 1999). *Payne* at *5.

In *In re: Grand Jury Investigation*, 545 F.3d 21 (1st Cir. 2008), an Assistant United States Attorney handling a grand jury investigation forwarded to counsel for a cooperating witness a motion and the order granting the motion. The receiving attorney, Harper, published those documents to a reporter for the Wall Street Journal and at least two other journalists. These documents "were effectively under seal" by virtue of a local rule of court providing that all documents filed with the clerk concerning grand jury proceedings were to be sealed. *Id.*at 23, citing D. Mass. R. 106.1(b). However, the copies forwarded by the AUSA were not marked as being under seal. *Id.* Ordered to show cause, the receiving attorney asserted he had no knowledge of the seal and his violation of the local rule was therefore unwitting. *Id.* at 24. The court found that Harper did not know of the local rule and was not chargeable with knowledge of the rule since he was not a member of the Massachusetts bar or the bar of the District Court for Massachusetts and did not regularly practice criminal law. *Id.* at 27. The trial court also found no actual obstruction of the administration of justice was caused by the disclosure. Harper eschewed any further disclosure after the show cause hearing. The First Circuit affirmed the

district court had inherent power to sanction for contempt independent of any statute or rule.  *Id.* at 25, citing *Chambers v. NASCO, Inc.,* 501 U.S. 32 (1991).

*Kimsey* itself cites *United States v. Marthaler*, 571 F.2d 1104 (9th Cir. 1978), and *United States v. Kozel,* 908 F.2d 205 (7th Cir. 1990), as cases where criminal contempt was used to enforce local rules, but dismisses their precedential value, stating "'unstated assumptions on non-litigated issues are not precedential holdings binding future decisions.'" *Kimsey*, 668 F.3d at 699, *citing Proctor v. Vishay Intertechnology Inc.*, 584 F.3d 1208, 1226 (9th Cir. 2009) (quoting *Sakamoto v. Duty Free Shoppers, Ltd.*, 764 F.2d 1285, 1288 (9th Cir. 1985)).  The *Brown* court noted *Seymour v. United States,* 373 F.2d 629 (5th Cir. 1967), where a general order about courthouse photography was enforced in contempt.


### Conclusion as to Use of Contempt Power


Respondents' arguments do not persuade the Magistrate Judge that contempt may not be used to sanction violations of the Court's local rules.

As to the meaning of "rule" in 18 U.S.C. § 401(3), the Ninth Circuit's argument in *Kimsey* is not conclusive.  While "rule" may in 1831 have meant only a particular ruling as in "*rule nisi*", that language was reenacted by Congress in 1948 when regulating the practice in federal courts by general rules adopted by the courts themselves was well-established.  This Court is not limited to the meaning of the word at its original adoption in 1831 when it had acquired a different meaning by the time of its reenactment.[15]  While the Court retains the power

---

[15] The fourth edition of Black's Law Dictionary, published in 1951 closest to the 1948 reenactment, carries as its first definition "an established standard, guide, or regulation. . . . A regulation made by a court of justice or public office with reference to the conduct of business therein."  The second definition is the older one:  "An order made by a court, at the instance of one of the parties to a suit, commanding a ministerial officer, or the opposite party, to do

to punish with contempt violations of particular orders, such as the Orders to Show Cause here, there is no sufficient reason not to exercise that power for violation of general rules adopted with all the safeguards outline above.

The *Kimsey* court's *reductio ad absurdum* argument should also not dissuade us. Of course it would be an abuse of power to punish with a criminal sanction a lawyer's failure to follow form requirements such as margins or type size.[16] The contempt sanction is not to be used when lesser sanctions will suffice. *Spallone v. United States*, 493 U.S. 265, 276 (1990), *quoting Anderson v. Dunn*, 19 U.S. 204, 231 (1821)("in selecting contempt sanctions, a court is obliged to use the 'least possible power adequate to the end proposed.'") The fact that a power can be abused does not imply the power does not exist, but rather cautions discretion in its use.

While not every violation of the local rules would merit a contempt sanction, it is easy to hypothesize violations other than the ones committed in this case which might, in the exercise of discretion, warrant a citation in contempt. For example, S. D. Ohio Civ. R. 7.3 requires counsel to consult an opposing attorney before filing a motion for extension of time. Failure to comply is usually just a nuisance, remedied by denying the extension until a reaction from opposing counsel is elicited and reported. But there might well be an attorney who persistently failed or refused to follow the rule. Or note S. D. Ohio Civ. R. 16.3(c) which protects the confidentiality of communications in mediation; a contumacious violation is easy to imagine. Finally, note S. D. Ohio Civ. R. 47.1 which prohibits questioning jurors about the verdict or deliberations and is

---

some act, or to show cause why some act should not be done." This latter language reproduces verbatim the third definition of "rule" in the second edition from 1910 relied on in *Kimsey*. On the care not taken in revising Black's various editions prior to the seventh, see Brian A. Garner, "Legal Lexicography," 6 Green Bag 2d 151 (Winter, 2003). Garner became the chief editor of Black's in 1994 and writes of errors in early editions perpetuated until the thorough re-examination which occurred with the seventh edition. *Id.* at 157.

[16] In fact, Fed. R. Civ. P. 83 arguably prohibits such a result when it provides "A local rule imposing a requirement of form must not be enforced in a way that causes a party to lose any right because of a nonwillful failure to comply."

intended to protect the integrity of verdicts. Here, too, a willful violation might call for criminal contempt.

It is therefore respectfully recommended that the Court reject Respondents' general defense that the contempt power cannot be used to enforce local rules.

**Particular Defenses to the Use of the Contempt Power in this Case**

### The Disclosures by Respondents Were Not "Unauthorized"

Respondent Yosowitz asserts his particular disclosure of the Walden PSI by emailing it to Captain Anderson does not constitute an "unauthorized disclosure" of the report (Motion, Doc. No. 11, PageID 33-37). He first asserts that Rule 32.1(k) does not identify who is permitted to authorize disclosure of a PSI. *Id.* at PageID 34. That argument is refuted by S. D. Ohio Crim. R. 32.2 which reserves that authority to the Chief Judge. Respondent argue "[a]nother plausible possibility is that the defendant is authorized to disclose his PSR." That also conflicts with by S. D. Ohio Crim. R. 32.2.

Respondents argue persuasively that by placing the PSI in Kimber Barker's trash, Walden abandoned any property interest in the particular copy he possessed and any privacy interest in the contents of the PSI (Motion, Doc. No. 11, PageID 35-36).[17] But that does not mean that no one has an interest in the confidentiality of that document. Walden has now been

---

[17] In his accusatory emails to Barker, Walden does not actually admit putting the Walden PSI in Kimber Barker's trash, but he does not deny it in circumstances where such a denial might be expected. For example, he threatens Barker with legal action for disseminating the PSI, but not for any impropriety in obtaining it. See PageID 76.

indicted[18] on several counts of sexual misconduct arising out of his relationship with JF which corroborates Dr. Barker's assertion that JF wished to press charges.  But if JF had wanted to keep that information confidential, she would have had an interest protected by S. D. Ohio Crim. R. 32.1(k).  The institutional interests recognized in *Chalmers, supra,* are applicable to this case as well.  In any event, the fact of Walden's disclosure by trashing does not logically imply he was authorized to disclose the document, much less that his disposal somehow authorizes Respondents to read, copy, and disclose the document.

### The Disclosures Were Not Willful

Criminal contempt of court is a crime "in the ordinary sense of the word."  *Bloom v. Illinois*, 391 U.S. 194(1968).  To be criminally punished, the contempt must be willful.  *United States v. United Mine Workers of America*, 330 U.S. 258, 303 (1947); *In re Smothers*, 322 F.3d 438, 441-42 (6th Cir. 2003).

Yosowitz argues that, to prove willfulness, it must be shown that he actually knew of Rule 32.1(k) and violated it with the express intention of doing so.  That argument stretches the willfulness requirement beyond its legal limits.  In *Smothers, supra*, the Sixth Circuit held willfulness could be "inferred if a lawyer's conduct discloses a reckless disregard for his professional duty." *Id.* at 442, *quoting United States v. Delahanty*, 488 F.2d 396, 398 (6th Cir. 1973).  In this case, Yosowitz is not only an attorney, but is admitted to practice before the very court whose confidential PSI he copied and distributed.  Although he does not acknowledge it in

---

[18] www.daytondailynews.com/news/news/crime-law/former-soccer-coach-indicted.  Posted Dec. 26, 2013; visited Feb. 17, 2014.

his Affidavit, the Walden PSI is endorsed "CONFIDENTIAL"[19] in capital letters 5/16" tall on its

first page.  Although Yosowitz claims he was unaware of the rule, he certainly should have been

aware of it, as the local rules were part of the examination he had to pass to become a member of

the bar of this Court.[20]  What professional duty devolves on a member of the bar of this Court

when he or she receives a copy of a court document stamped "CONFIDENTIAL"?  Yosowitz,

by his own account, did nothing to inquire into the meaning of that legend or the confidentiality

of PSI's in this District or generally, except to rely on the scant research done by the referring

partner who practices domestic relations law.  Indeed, Ms. Beasy's Affidavit claims she made

the reference to Yosowitz because he has been a criminal law practitioner and she has not.

Yosowitz asserts that he "would never willfully, deliberately or intentionally violate a court order

or local rule" (Affidavit, ¶ 19, PageID 55), but he has done nothing to apologize to the Court for

his conduct or to turn over to the Court any remaining copies he may have

Dr. Barker more plausibly claims lack of knowledge of the Rule (Barker Affidavit, Doc.

No. 12-1, PageID 69, ¶ 11).  The general public is not chargeable with knowledge of the content

of local rules of court which are, after all, intended to regulate practice in the courts and not the

behavior of the general public.  Dr. Barker's ignorance is even less culpable because his

attorneys did not tell him of the Rule and the language about nondisclosure on page two of the

Walden PSI appears to be addressed to persons who might receive the PSI after it was disclosed

to the Bureau of Prisons rather than to the general public.

In sum, Barker has established that his violation of Ruel 32.1(k) was not willful;

Yosowitz has not done so.

---

[19] The record does not disclose whether Barker sent Yosowitz a color copy; if he did, then the legend was even more visible, being stamped in red.
[20] That examination was abolished in 2011, but was a requirement of admission for at least forty years before that.

26

**The Disclosures Were Mandated by State Law**

Both Respondents claim that they were required by Ohio law to report the information in the Walden PSI about child sex abuse to law enforcement, relying on Ohio Revised Code § 2151.421(A)(1)(a) and (b). Paraphrasing, the statute requires any person in certain classes of people, including attorneys and physicians, acting in an official or personal capacity who knows or has reasonable cause to suspect that a minor has suffered abuse to immediately report that knowledge or suspicion to the public children services agency or the police. Respondent Yosowitz took the additional prudent step of confirming the suspicion with J.F.

Yosowitz asserts that his "act of forwarding Walden's PSR to Captain Anderson to simply corroborate [JF's] allegations of abuse is a reasonable and responsible act under the statutory duty foisted on him by §§ 2151.421[(A)(1)](a)& (b)." Not so. Although Ohio law imposed on Yosowitz a duty to report his knowledge or reasonable suspicion to the police, it did not give him the privilege to furnish Walden's PSI in contravention of a federal policy, enforced by local rule, that that document was to be kept confidential.

Barker's "mandated reporter" defense is also without merit. Although physicians are mandated reporters under Ohio Revised Code § 2151.421(A)(1)(a) and (b), they are only obliged to report when they learn the relevant facts "in a professional capacity." Suspicious ex-spouse or even parent is not a "professional" capacity within the intendment of the statute.

**Advice of Counsel Defense**

Barker asserts that he acted pursuant to advice of counsel and asserts that is a complete defense, citing *United States v. Tandon*, 111 F.3d 482, 490 (6th Cir. 1996), and *United States v. Hatchett*, 918 F.2d 631, 638 (6th Cir. 1990).  In *Tandon*, a conviction for tax evasion was upheld against a claim, inter alia, that the district court should have given an advice of counsel defense instruction; there was no disclosure to an attorney.  *Tandon* cites to *Hatchett*, which is also a tax case, not a contempt case.  At least under Ohio law, advice of counsel may go to mitigation, but is no defense to a charge of contempt.  *State, ex rel Adkins, v. Sobb,* 39 Ohio St. 3d 34(1988); *Windham Bank v. Tomaszczyk*, 27 Ohio St. 2d 55 (1971).  No federal authority to the contrary is cited by Barker.

In any event, the record by way of postmarks supports the inference that Barker sent the copies to North and Andrykowski on June 14, 2013, before he received any advice from counsel and indeed before counsel was retained on June 17, 2013.

**Equivocal Notice**

Dr**.** Barker complains that the show cause order speaks of civil and/or criminal contempt and inadequately advises him of what he must defend against.  The purpose of using notice in that form is to give a contemnor through notice of all the sanctions the Court may consider.

Civil and criminal contempt are distinguished by their purpose, civil sanctions being to remedy the effects of failure to comply with a court order or rule, criminal being to vindicate the court's authority by punishing a transgression.  *Hicks v. Feiock*, 485 U.S. 624 (1988), and *Brown*

28

*v. Executive 200*, 64 Ohio St. 2d 250 (1980). Of course the constitutional protections attendant on criminal convictions are fully applicable to criminal contempts:  heightened burden of proof, privilege against self-incrimination, right to appointed counsel for indigent contemnors.  All of those rights have been preserved in  this case.  As long as an alleged contemnor has been given sufficient notice to prepare to defend against criminal sanctions, he or she will have received sufficient notice for a civil contempt remedy.

**Conclusion**

Dr. Barker has established that his violation of S. D. Ohio Crim. R. 32.1(k) was not willful and he therefore should not be punished with a criminal contempt sanction.  While the Court would be within its authority to sanction attorney Yosowitz criminally, it should not do so because a criminal sanction is not necessary to vindicate the Court's authority in this case.  A civil remedy appears to be adequate.

It is therefore respectfully recommended that upon receipt of a written apology from Respondents for violating Rule 32.1(k) and their written certificate that they have surrendered to the Court all copies (in paper or electronic form) that they possess of the Walden PSI, the Court enjoins them from any further violations of the Rule, dissolves the Orders to Show Cause, and dismisses these contempt proceedings.  Should either Respondent fail or refuse to provide both

the apology and the certificate, the Court should proceed against that Respondent in civil

contempt.

February 19, 2014.

s/ *Michael R. Merz*
United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 153-55 (1985).